Hitchcock, J.
In the view the court take of this case, its decision depends principally upon questions of fact. It is true that questions of law have been argued, which, if certain facts were found to exist, would have an important bearing upon the case.
On April 24, 1816, Maxwell Hargraves and Anna, his wife, leased to the complainant, Philip Young, at an annual rent of $150, a lot of ground situate on the northeast corner of Main and Fourth streets, in Cincinnati, with a house standing on the same, for and during the term of the natural life of the said Anna. The property leased extended eighteen feet on Main ^street, and one hundred feet on Fourth street. The writing, purporting *285 to bo a lease, was signed by Maxwell and Anna Hargraves and by Philip Young, and was attested by one witness, but was not acknowledged.
In pursuance of this lease, Young took possession of the property, and continued in possession until after the death of Maxwell Hargraves.
This lot had been assigned to Anna Hargraves, as a part of her dower in the estate of her former husband, Seth Cutter. On July 26,1831, Maxwell Hargraves and Anna, his wife, sold and conveyed to Samuel R. Miller, for the consideration of $6,000, all her right, title, and interest in and to lot No. 85, in Cincinnati, bounded west by Main street, and south by Fourth street, extending about sixty-six on the former and one hundred feet on the latter. The land formerly leased by Young was a part of the lot so sold. At the time of this sale, F. Lawson, A. Ludlow, Joseph Murray, McChesney & Avery, and Philip Young were in possession of the entire lot, as stated in the deed, as tenants of Hargraves and wife. This deed contains a warrant of quiet enjoyment on the part of Hargraves and wife, securing to Miller the possession, rents, issues, profits, etc., “ saving to the said tenants, now occupying under said grantors, their legal rights.”
Subsequently, Miller, for the consideration of $7,500, transferred his interest, acquired under this deed, to John J. Worthington, Horatio G. Philips, and David Gwynne; Philips and Gwynne having previously become the owners of the reversionary interest in foe. By conveyances between these parties, the legal interest in that portion of the lot, under lease to Young, became vestod in Worthington.
Hargraves died in February, 1833, and soon thereafter, Worthington commenced an action of ejectment against Young, and recovered from him the possession of the leased property. This case was reserved on a motion for a new trial, and was decided in favor of the plaintiff at the December *term of this court, 1834. The court holding that “ a lease for life, by husband and wife, not acknowledged by the wife as the statute requires, is not available against the wife after the death of the husband.” 6 Ohio, 313.
Young then commenced an action against Hargraves’ administrator, upon a covenant of quiet enjoyment in the lease. This case was decided at the December term of this court, 1836. 7 Ohio, 63, pt. 2.
*286 Worthington having recovered in ejectment, commenced another ■action against Young for the mesne profits. That case came also into this court, and was decided at the December term, 1837. 8 ■Ohio, 401. In this suit Worthington recovered $1,030, and one object of the present bill is to compel him to refund the amount .so recovered.
Young subsequently filed a bill in chancery against the present defendants, making the same charges substantially, and praying the same relief as in the present bill. This last case was heard in this court at the December term, 1840. The bill was dismissed, and among the reasons assigned for the dismissal, one is that Mrs. Hargraves was not a party. 10 Ohio, 85.
The bill now under consideration was filed August 2, 1842, and in this bill Mrs. Hargraves and Young are complainants.
It is charged in the bill, that at the time when Miller entered into the contract for the purchase of this property, Hargraves and wife utterly refused to sell upon any other terms than that Young should be secured in the enjoyment of the jmoperty leased to him during the life of Mrs. Hargraves, at the stipulated rent of $150 per year. That Miller well understood such to be their determination, and that he expressly agreed so to draw the deed to be ex-■eeuted to himself, that such right should be secured to Young. That Miller, at the time the deed was executed, represented that it was so drawn, and that they would never have executed it had they known that Young’s *right to the enjoyment of the property during the life of Mrs. Hargraves, was not secured. It is further charged that Miller, by mistake or design, so drew the ■deed that Young’s rights were not protected. That all the defendants were jointly interested in the purchase; that Miller effected the same as well for the benefit of Worthington, Philips, and •Grwynne as of himself. That Worthington, PEilipos, and G-ywnne had full notice of this agreement, and that Young’s rights were to bo protected.
It is prayed in the bill that the deed so fraudulently obtained may be reformed so as to conform to 'the contract between Hargraves and wife, and Miller, thereby securing Young’s rights; that Young may be reinstated in the possession of the property; •that Worthington may be comp elled to refund the amount of the judgment for mesne profits; that an account may be stated of the .¡rents and profits of the leased premises, and for general relief.
*287 The defendants have all answered.
Miller admits the purchase from Hargraves and wife, but denies that Worthington, Phillips, and G Wynne had any interest in, or •any knowledge of his intention to purchase, until after the same was made. He denies explicitly that there was any understanding or agreement as stated in the bill, as to securing to Young any •interest over and above that which was secured by his lease. Says that the deed was explained to and perfectly understood by Hargraves and wife. Denies that any intimation was made by them, or either of them, that Young should be secured otherwise than ho was secured by the deed. Denies all fraud, etc. Since this answer was filed Miller has died, and his administratrix,is made party.
The other defendants admit that they purchased the property of Miller, but deny that they had any notice of any understanding, arrangements, or agreement between Hargraves and wife, and Miller, otherwise than appears from the face of the deed. If there was any such agreement as set forth *in the bill, they claim that not having any notice thereof, they are innocent purchasers without notice.
A question has been raised in argument whether the answers •of the defendants in this case can be considered as evidence, inasmuch as the complainants did not call upon them to answer under oath. Under a late statute a complainant may, if he think proper, dispense with the oath of the defendant by so stating in his bill, and in such case the answer is not evidence. But this bill was filed before the enactment of that law. The defendants are called upon to answer—whether under oath or not is not stated. But the statute then in force required all answers to be upon oath, and by the practice of this court, answers, so sworn, to have been considered as evidence.
The first question presented by the bill and the answer of Miller (and it is the great question of the case) is whether there was any such agreement or understanding between the Hargraves and Miller, as is stated in the bill,—whether there was, in fact, any fraud or mistake in the transaction, on the part of Miller.
In the case referred to in 10 Ohio and which was similar to the one now before us, the court find this matter to be proven as stated in the bill. What evidence was before the court at that time we know not. They may have had the- testimony of Mrs. *288 Hargraves, or the testimony of other witnesses, which is not now before us. Taking the testimony as presented to us, there are but three depositions by which it is attempted to prove directly the charge. There are, it is true, the depositions of Carter, Cutter, and Thoms, who testify to conversations they had with the Hargraves, both after and before the execution of the deed to Miller. Carter and Thoms say they were anxious to buy this-land, and that Hargraves and wife refused to sell upon any other terms than that Young should be secured in the enjoyment of his lease during the life of Mrs. Hargraves. Cutter confirms this statement. But neither ^one of these witnesses had any knowledge of the contract with Miller. Admitting that it was competent to prove the declarations of Hargraves and wife, before the execution of the deed, certainly their declaration, subsequent to its execution, must be excluded. This kind of evidence is all objected to.
Joseph Murray, a witness examined by complainant, proves the whole case, not only as against Miller, but as against the other defendants. His deposition was taken at St. Louis on October 17, 1843, and there was no cross-examination. He states that he made the contract with Miller,—that Miller was informed of the determination of Hargraves and wife to sell upon no other conditions than that Young should enjoy the property by him rented, during the life of Mrs. Hargraves. That Miller agreed to purchase upon these terms, and that such provision should bo made in the deed. That Miller called upon him frequently before the contract was closed, he acting as the agent of Hargraves, who was his father-in-law. That Worthington called frequently upon him, upon the same business. Stated that it made no difference whether ho or Miller purchased. That he was acting for Phillips and Gwynnc, and that they were partners. That Worthington was present in the office when Miller was drawing the deed, and knew all about it. That Worthington, Phillips, and Young, knew all about the terms upon which Miller purchased. He also states-what took place when the deed was executed. If this witness is to be relied upon, nis testimony neutralizes the answer of Miller, to say the least of it. But is it to be relied upon ? We have the deposition of this same witness, taken in February, 1839, in the suit of Young v. Miller and others, at a time when the transactions, relative to this purchase of Miller, must have been as fresh in his *289 recollection as they could have been three years afterward. But in this deposition of 1839, some of the most material facts stated in the subsequent deposition are entirely omitted. When this first deposition was taken, the witness *was cross-examined. Besides this, there is evidence conclusive in our minds to show, that at the time of this purchase by Miller, and at the time of drawing or making out the deed, Worthington, instead of being in the office with Miller, was not in Cincinnati; nor was he there during the whole time of the negotiation. Instead of any understanding or arrangement between Miller and Worthington previous to the purchase, one witness testifies that when Worthington learned that Miller had purchased, he was very much dissatisfied, and that there was quite a controversy between them. Besides, in order to get the land from Miller, Worthington was compelled to pay him $1,500 for his bargain. Although this witness tells of what took placo at the time of the execution of the deed, it is clear that he was not present, and, of his own personal knowledge, could have known nothing about it. It seems to us, that when a witness is thus inconsistent with himself, and when he is thus flatly contradicted by others, that his testimony should have no weight with the court.
The other two witnesses relied upon by the complainant, and who testify as to the contract, are Hannibal and Hercules Hargraves, one of whom is a witness to the deed. They are the sons of Maxwell and Anna Hargraves. They concur in the statements which they make. Both say they were present when this deed was executed. They state explicitly, that their father and mother at all times refused to sell this property upon any other terms, than that Young should be secured. They say that this matter was talked over at the time of the execution of the deed, and that Miller insisted that ample provision was made in it for his security. They state further, that their mother was unwilling to execute the deed to Miller, and that she never would have done it but for the threats of their father, who they say was a violent man. That she was very much afflicted about it, and cried for a full month before, and for a number of months after it was executed. They say further, that Judge Henderson, the magistrate who took the acknowledgment, *was excited by liquor when he came to the house to do the business, and that he soon became so drunk that he did not know anything.
*290 Judge Henderson has been examined by the defendants, and entirely contradicts the statements of these two witnesses. He says that Hercules Hargraves was not in the room at all, during the time business was being transacted. That Hannibal was not present until he called in to subscribe his name as a witness. That not one word was said about securing to Young any other rights1 than his legal rights. That he carefully explained to Hargraves and wife, when together, and to the wife, when separated from her husband, the contents of the deed; that they seemed to understand it and its effects, and appeared to be satisfied therewith.
Here, then, we have the testimony of Hannibal and Hercules Hargraves, confirming the contract as stated in the bill; and the testimony of Milter and Henderson disproving it. And taking the whole together, it can not bo said that this testimony is affirmative in its character upon the one side, and negative on the other. So far as the number of witnesses is concerned, the testimony is equally balanced; and under such circumstances, if there is no other circumstance or testimony to control the case, the bill should be dismissed.
But Miller is a party to the suit, and, of course, although his answer is evidence, still it may be thought that the same reliance should not be placed upon that answer, as upon the testimony of a disinterested witness. Henderson is a disinterested witness, and he confirms the statements made in the answer. Is this evidence overcome by the testimony of Hannibal and Hercules Hargraves.
We have before us a deposition of the former, taken and road in evidence, on the trial of the caso of Young against these defendants, which has been referred to. That deposition is variant from the one taken in this case. It contains no statement relative to the intoxication of Henderson, nor as *to the unwillingness of Mrs. Hargraves to execute the deed. Both these witnesses state that she was unwilling to execute it; that she was induced to do ■it from fear of her husband; and that she wept about it for a ■month before, and for months after it was executed. It is pretty clear, from the other testimony in this case, that two weeks did •not transpire from the time Miller first engaged in the negotiation ■for this purpose before the deed was executed.
■It is further in proof, that when these witnesses went before the .magistrate to give their depositions, the questions to be pro *291 pounded, and the answers to be given, were reduced to writing, not by the witnesses themselves, but by some other person; and that the depositions were made out principally, by copying these questions and answers.
There is also the testimony of a number of witnesses, who give these two Hargraves a bad character, and say they would not believe them under oath. Others say they would believe them. Under all these circumstances, we have no hesitation in saying, that we place more confidence in the answer of Miller, and the testimony of Henderson, than in the testimony of these two men.
But it is claimed for complainants, that there is something suspicious in the circumstance, that by the terms of the deed, the legal rights of the tenants should be saved. Upon examination of the deed, I do not discover anything so very singular in this. In the body of the deed there is a statement that certain persons, naming them, are in possession under Hargraves and wife. Then follows a covenant for quiet enjoyment, and in connection with this, the legal rights of the tenants are saved. This clause, I suppose, was introduced rather by way of exception, in favor of the covenantors, than for the purpose of securing any right to the tenants.
The testimony of Thoms, Carter, and Cutter is relied upon as strong circumstantial evidence, to show the fixed determination of Hargraves and wife not to sell, unless Young was secured. But, on the other hand, Henderson ^testifies that when Hargraves called upon him, to request him to attend at his house, to take the acknowledgment of the deed to Miller, he (Hargraves) stated to him, that his wife never had, and never would execute the lease to Young. Blachly says that he negotiated with Hargraves and wife for the purchase of this property. That when he first applied to them, $3,000, or $3,500, was talked of as the price; although no definite price was named. That they afterward advanced to $6,000, stating that Young’s lease was not valid, and he supposed it was for this reason that the price was increased. Ho says further, that at no time did they intimate to him a desire that Young should be secured in anything beyond the legal effect of his lease.
If these people were, in fact, so extremely anxious to secure Young, it is, to say the least of it, strange indeed, that they should have neglected to do it while they had the power.
*292 Under all the circumstances, we are of opinion that the complainants do not make a case entitling them to relief, and the bill is therefore dismissed, with costs.